Filed 9/22/25  In re E.B. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re E.B. et al., Persons Coming Under the Juvenile Court Law. | |
| KINGS COUNTY HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>J.B. et al.,<br><br>    Defendants and Appellants. | F089170, F089337<br><br>(Super. Ct. Nos. 22JD0029, 22JD0030)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Kings County.  Richard J. Guiliani, Judge.

Roshni Mehta, under appointment by the Court of Appeal, for Defendant and Appellant J.B.

Laura D. Pedicini, under appointment by the Court of Appeal, for Defendant and Appellant B.L.

Laurie Avedisian-Favini, County Counsel, Thomas Y. Lin and Ana Dominguez, Deputy County Counsel, for Plaintiff and Respondent.

---

[*]        Before Franson, Acting P. J., Peña, J. and Snauffer, J.

-ooOoo-

J.B. (mother) and B.L. (father) appeal from the January 9, 2025, orders terminating their parental rights to now eight-year-old twins, O.B. and E.B. (together the children) pursuant to Welfare and Institutions Code section 366.26.[1]  Mother alleges that the juvenile court erred when it found the beneficial parent-child relationship exception to termination of parental rights was inapplicable.  Both mother and father contend the Kings County Human Services Agency (agency) did not comply with its inquiry duties under the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.).  The agency concedes it did not fully comply with aspects of its inquiry duties and therefore agrees that a limited remand is appropriate.

We find no merit to mother's claim of error on the part of the juvenile court in finding the beneficial parent-child relationship exception inapplicable, but we accept the agency's concession as to its duties of ICWA inquiry.  We conditionally reverse the order terminating parental rights, and remand for the limited purpose of compliance with ICWA and its related statutory provisions.  In all other respects, we affirm.

## STATEMENT OF THE CASE AND FACTS

*Background*

In December of 2021, the agency conducted an investigation after it was alleged mother was overconsuming alcohol while the children were in her care.  The agency implemented a 30-day safety plan with mother and, eventually, mother was able to establish therapeutic services to address her alcohol use and the referral was closed.

On March 20, 2022, the agency received a referral that one of the children called maternal grandmother to say an unknown male had dropped alcohol off at the house and mother was drinking.  Law enforcement arrived, determined mother to be under the

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

2.

influence, and took the children to their maternal grandparents'[2] home. Mother was later placed on a psychiatric hold after she voiced suicidal thoughts. Maternal grandmother reported that she thought mother had been drinking to the point of "blacking out" for about a year. She also stated that she and maternal grandfather were the primary caregivers for the children as mother worked long hours as a dispatcher.

When mother spoke to the social worker, she stated that she had been sober since December of 2021, but had just begun drinking again due to the toxic environment with her boyfriend. She stated that, while she had been drinking when law enforcement came to her home, she was not intoxicated. Mother also refuted claims of doing harm to herself and that she was never placed on a psychiatric hold but released.

*Detention*

On March 22, 2022, the agency filed a section 300 petition alleging the children were at risk of harm due to mother's inability to provide care for them due to her alleged alcohol addiction. No allegations were filed against father, who was living separately in Los Angeles at the time.

When the agency spoke to father, he stated he had weekly FaceTime calls with the children. Father stated he was leaving for Tennessee at the end of the month and hoped the children could be returned to mother.

The detention report filed March 22, 2022, stated that both mother and father denied Native American Ancestry.

The children were detained at the March 23, 2022, detention hearing. At that time, both mother and father were present and asked if they had any Indian ancestry. Both replied that they did not, and the juvenile court found that the ICWA did not apply. Both completed ICWA-020 (parental notice of Indian status) forms stating each was without

---

**2** Maternal grandmother and step-maternal grandfather are designated as the maternal grandparents. Maternal grandmother and maternal biological grandfather are divorced. Maternal grandfather is designated as the biological maternal grandfather.

Indian ancestry. Maternal grandparents were present at the detention hearing, but they were not asked about Indian ancestry. A jurisdiction and disposition hearing was set for April 14, 2022.

On April 11, 2022, the agency filed a first amended section 300 petition, which eliminated certain specific details about the incident in December 2021 involving mother, but again did not include any allegations against father.

*Jurisdiction and Disposition*

The report filed by the agency in anticipation of jurisdiction and disposition recommended family reunification services for both mother and father. Mother reported that she began drinking heavily due to issues with her then boyfriend, and hit "rock bottom" in December of 2021. She alleged that she stayed sober until March of 2022, but then relapsed when she broke up with her boyfriend. As a result, she also lost her job. Mother had been attending therapy sessions since January of 2022. She did not like the religious principles of Alcoholics Anonymous (AA), but said she would attend another type of support group.

The agency report discussed father's relationship with paternal grandmother, with whom he was temporarily living. Father described his relationship with paternal grandmother as a good relationship.

The children, both diagnosed with autism and described as thriving off of structure, were placed with maternal grandparents. An initial supervised visit between mother and the children went well.

The agency report stated it would be premature to release the children to the care of father, as the children had had minimal contact with him and he was now out of state in Tennessee. The agency was unable to begin the process of completing an interstate compact on the placement of children (ICPC) until father provided information.

On April 14, 2022, both mother and father submitted on the agency's report as to jurisdiction and disposition. The juvenile court found the allegations of the first amended

petition true and the children were adjudged dependents of the court. Both mother and father were offered reunification services. A six-month review hearing was set for October 6, 2022.

*Six-Month Review Report and Hearing*

The report prepared for the six-month review hearing stated that mother had been assisted with housing, but she was terminated for not being in compliance with the program. Thereafter, mother moved to San Bernardino County and got employment at an indoor playground and family activity center. Mother claimed to have attended 20 psychotherapy sessions and enrolled in alcohol and other drug services (AOD) where she attended groups twice a week. She tested negative for all substances on two occasions and positive for marijuana on three occasions, but she denied using marijuana. Mother reported that she had consumed alcohol twice at work events because she felt pressured to do so. She had not participated in AA/NA meetings due to philosophical differences, but had a support person in recovery. Mother failed to provide the name or contact for her support person when requested by the agency.

Weekly visits with the children went well, and in September of 2022, mother was allowed an overnight visit with the children at maternal grandparents' home. However, the maternal grandmother reported that mother slept during the visit and did not engage with the children.

Father moved back to California from Tennessee during the review period, but had not had contact with the agency and his whereabouts were unknown.

At the six-month review hearing October 6, 2022, the juvenile court ordered reunification services for mother and father continued, finding mother had made moderate progress and father minimal progress toward alleviating or mitigating the causes necessitating the placement of the children in out of home care. Maternal grandparents were both present at the hearing. A 12-month review hearing was scheduled for March 30, 2023.

*12-Month Review Report and Hearing*

The agency filed a 12-month review report and several addendum reports. In November of 2022, mother was allowed an unsupervised visit at her home in Yucaipa with the children. But when the children were dropped off at mother's home, there was an unidentified male at the home as well, even though mother had said he would not be there. Mother told the social worker she "did not know what to do" when the male came over, but she was not going to be seeing him anymore.

In December of 2022, mother tested positive for alcohol. In January of 2023, mother enrolled in behavioral health services and had attended eight of 11 treatment groups. In February of 2023, mother tested negative for alcohol but tested positive for THC. Mother claimed not to know why she tested positive and thought her urine test had been switched with someone else's. Mother was attending virtual AA meetings and had a temporary sponsor.

Father moved to San Jose in December of 2022, but was unable to have the children with him as he had roommates. He admitted to not having spoken to the children since October of 2022, but blamed it on their caregivers.

At an agency meeting on January 23, 2023, mother expressed frustration with maternal grandparents, stating they were keeping the children from her. Mother described her relationship with maternal grandparents as toxic, and their relationship, along with her attempt to "stay clean," were reasons she moved out of Kings County. Mother admitted drinking "here and there," and she last drank two weeks prior. Paternal grandparents were present at the agency meeting, and it also appears that the biological maternal grandfather was present as well.[3]

---

[3] The record reflects that a "Mr. B. (paternal grandfather)" was present. However, as that is mother's last name it can be inferred this is her biological father, or the biological maternal grandfather. The maternal stepgrandfather's name is S.L.

6.

Mother and father had a supervised visit with the children in February 2023, which had gone well, although the children were heard referring to father by his first name after he asked them if they remembered him.

The agency recommended that reunification services be terminated and a section 366.26 hearing set.

At the 12-month review hearing held April 19, 2023, the juvenile court granted the maternal grandparents' request for de facto parent status and followed the recommendations of the agency and terminated reunification services for both mother and father, finding both had made only moderate progress in the services provided. At the conclusion of the hearing, county counsel inquired, "[w]hile we have the mother, the father, and the maternal grandparents present … It's my understanding that [the] children do not have any Native American ancestry and that it is also true for their extended family. Is that the case?" In response, everyone shook their heads no.

A section 366.26 hearing was scheduled for August 9, 2023.

<u>Section 366.26 Report</u>

The section 366.26 hearing agency report described visits between mother and the children as going well. The report reflects that on May 25, 2023, maternal grandmother denied having any Native American ancestry in her family. The report also stated that the children visited with the biological maternal grandfather and the paternal grandfather via video chat.

The agency recommended termination of parental rights, stating it would not be detrimental to the children as they had been cared for by the caregivers "for most of their life on and off." The report noted mother's visits with the children had gone well, but that they had not been able to advance to unsupervised visits as mother had violated the safety plan by having an unidentified male in the home. Father last visited the children in April of 2023, and had not kept contact with the agency.

7.

*Section 388 Petition*

On August 7, 2023, mother filed a section 388 petition asking that she receive either family maintenance or additional reunification services because she completed out-patient substance abuse treatment, was attending AA/NA meetings two to three times a week, had a sponsor, was employed, and maintained visitation with the children.

In its response, the agency noted mother had completed substance abuse services in July of 2023, but had not drug tested since. It recommended a continuance for a hearing on the section 388 petition so that the agency could check into mother's "current circumstances" and mother could participate in additional drug testing. Subsequently, in September of 2023, the agency filed a continued response and this time recommended that mother be granted additional reunification services. Mother had now moved back to Kings County and planned to move closer to the children. August 2023 drug tests on mother were negative. Overnight visits with the children at maternal grandparents' home had gone well.

On September 21, 2023, the juvenile court held a section 388 hearing. Mother withdrew her contest to the section 388 petition and instead submitted on the recommendation of the agency for services. The juvenile court granted the section 388 petition and ordered mother an additional six months of services, requiring her to attend agency meetings, complete a mental health assessment, participate in codependency courses, maintain stable housing, demonstrate independent living skills, participate in the children's medical and school appointments, complete an outpatient program, and submit to random drug testing. The 18-month review hearing was scheduled for March 14, 2024.

*18-Month Review Report and Hearing*

In its status review report and addendum reports for the 18-month review hearing, the agency recommended termination of reunification services. Mother lived in an apartment in Lemoore and worked full time. During the review period, mother attended

an outpatient program and completed a mental health assessment but missed three out of four therapy appointments and one of four case management appointments. Mother was also enrolled in a co-occurring treatment program at Kings View and was attending groups, but acknowledged that she relapses to alcohol to the point of blacking out when she is alone. She blamed it on missing her children. Mother took part in AA/NA meetings between September and November of 2023, but indicated that they were reminders of generational trauma she had experienced. Mother tested positive for alcohol on December 7, 2023; she was "visibly intoxicated" when transported to the testing center. While mother attended parent-teacher conferences for the children, she did not attend their medical or dental visits, although she was informed of them. Mother attended the majority of weekly visits with the children and interacted appropriately. However, the social worker felt mother's behavior at a November 9, 2023, visit was "irregular", but could not determine why.

At the contested review hearing March 21, 2024, mother and father withdrew their request to contest the agency's recommendation to terminate services and submitted on the reports. The juvenile court terminated reunification services and mother was advised of her right to file a writ petition.

The section 366.26 hearing was scheduled for July 11, 2024.

*Section 366.26 Report*

The agency filed a section 366.26 report June 28, 2024, recommending termination of parental rights. The children did not have any major academic or health issues and were comfortable in maternal grandparents' home. The maternal grandparents were committed to adopting the children. Mother continued to visit the children, and she interacted with them appropriately. Both children stated that they wanted to visit mother but wished to stay in maternal grandparents' home. It was mentioned in the report that a social worker supervised a visit in March of 2024 in which father FaceTimed with the paternal grandmother.

9.

*Section 388 Petitions*

On July 3, 2024, mother filed a second section 388 petition requesting either family maintenance services or additional family reunification services. Attached to the petition were various documents: mother's declaration that she was attending an outpatient program and that her sober date was January 15, 2024; she was prescribed medication to aid in her recovery and she was seeing a therapist to address trauma that contributed to her use of alcohol; she completed two eight-hour parenting classes; and she attached a letter from a marriage and family therapist whose opinion was that mother could provide a safe and nurturing environment for the children.

On July 5, 2024, father filed a section 388 petition requesting that the children be placed in his care with family maintenance services or that he receive additional reunification services.

The agency's response to both section 388 petitions requested that the juvenile court deny them. The agency's response to mother's petition noted that mother voiced her concern that the agency's involvement was out of proportion to her issues and that she blamed her drinking on an abusive relationship with an ex-boyfriend and later on missing her children. The agency noted mother's difficulty in stabilizing housing; and while she was actively engaged in an outpatient program at Kings View, she refused to sign a release. While the agency acknowledged that mother was engaging in services and able to articulate her path to recovery, it did not recommend affording mother additional services because of her inability to sustain sobriety over time.

*Caregiver Information Form*

Maternal grandparents filed a caregiver information form on August 16, 2024, indicating that the children had relationships with their maternal and paternal grandparents, aunts, uncles, and cousins.

*Contested Section 366.26 and Section 388 Hearing*

After several continuances, the contested hearings were held November 20 and 21, 2024.

### Testimony of Brenna Kantner

Brenna Kantner, a licensed marriage and family therapist, was found to be an expert "for the purposes of safety assessment." Katner testified that she met with mother "a handful of times" and opined mother had the ability to provide a safe environment for the children. Kantner did not meet with the children, maternal grandparents, or agency social worker. Kantner referred mother to therapy so that mother could address her trauma issues and gain a support system.

### Testimony of Marc Koch

As a result of the Kantner's referral to therapy, mother received services from Marc Koch, a licensed family and marriage therapist. He had been working with mother since May of 2024.

Koch testified he met weekly with mother and assisted mother through cognitive behavioral therapy in dealing with her court case and how it was affecting her. Koch felt that mother was fully engaged during sessions and had gotten better at processing stressors, which would help her in parenting. On cross-examination, Koch acknowledged that his sessions with mother dealt more with her mental health and did not necessarily address any issues with her alcoholism. Koch's opinion that mother be given full custody of the children was based on what mother told him during their sessions. Koch had no interaction with the children.

### Testimony of Kari Herbert

Kari Herbert, designated as an "expert in certified alcohol and drug counseling," conducted a "level of care placement" assessment for mother. Herbert met with mother on one occasion on October 24, 2024, for an hour. At the time, mother reported she had been sober for nine months. Herbert testified that mother was engaged in cognitive

11.

behavioral therapy to address her alcohol abuse, she was taking medication for anxiety and depression, and was taking Naltrexone. Herbert opined that these factors, along with a supportive family, assisted mother in maintaining her sobriety.

### Mother's Testimony

Mother testified that the children were born in October 2016, mother and father separated in October 2017 and divorced in August 2018. The children were born prematurely at 26 weeks and remained in the hospital for three months. Mother visited them every day and took them to see many specialists. The children then lived with mother until they were removed in March of 2022. Mother testified that she sought out services for the children, who were diagnosed with autism, she was involved in their school, and she was able to procure an Individualized Education Plan (IEP) for them. Mother testified that, during the dependency proceedings, she visited regularly, brought toys and games to the visits, brought snacks, and the children interacted with her. She had been able to have unsupervised visits for a few months at the end of 2022.

Mother currently lived in a two-bedroom apartment in Lemoore and had beds and a dresser for the children. She was employed and able to create her own schedule. She was working on her college degree online and anticipated obtaining her bachelor's degree before the end of October 2025. Mother married A.A. in May of 2024, and he was an emotional and financial support for her, as was his extended family.

Mother testified that she met with Dr. Mark Lasher, an addiction specialist, who prescribed mother Naltrexone in January of 2024. She continued to take the medication, which made mother nauseous at the smell of alcohol.

Mother's outpatient program included co-occurring classes once a week, which she began in January of 2024. The classes were intended to prevent relapse.

Mother testified on cross-examination that she thought her current section 388 petition was different from the first petition as she was now on Naltrexone, she was working with a therapist, and she was engaged in an outpatient program focused on

relapse prevention. She testified that, although she had been through two previous alcohol abuse programs, the current one was of longer duration, and she last tested positive for alcohol in January of 2024.

Mother acknowledged that, after her divorce, the children lived with her at maternal grandparents' for about one year. Mother described her relationship with maternal grandparents as rocky, but she was learning to deal with her emotions through her therapy sessions.

Mother acknowledged that, one to two weeks prior to her testimony, she sent an angry text to maternal grandmother that included foul language. Mother had tried to reach out and reconcile with maternal grandmother, but she was not willing to reciprocate.

On redirect, mother testified that at the last visit, the children said they wanted to live with her. Mother felt that, if her parental rights were terminated, the children would suffer detriment. Mother believed maternal grandmother was coaching the children against her.

### Testimony of Maternal Grandmother

Maternal grandmother testified for the agency that the children had lived with her off and on since they were 11 months old. Following mother's divorce, mother and the children lived with maternal grandparents. After mother moved out, she got an apartment down the street from maternal grandparents, and they provided childcare when mother worked.

Maternal grandmother first noticed mother inebriated in 2019, and it progressed from there. In October of 2023, maternal grandmother went to mother's apartment to check on her and found her on the floor lying in her own vomit and urine.

At the beginning of November 2024, mother sent a text to maternal grandmother asking what she was going to testify to in court. The text also included mother's statement that she wished relatives who had passed would haunt maternal grandmother

13.

and that mother would be better off with maternal grandmother dead. Maternal grandmother felt threatened by the texts and informed the social worker.

Maternal grandmother, who supervised visits between mother and the children, testified that there were no behavioral issues with the children at the end of visits. They would say goodbye to mother and give her hugs. The children were aware of what alcohol was, and they discussed scary times they had had with alcohol present. Maternal grandmother was listed as the primary contact with the school for the children, but mother interfered in August of 2024 and removed maternal grandmother from that role.

### Testimony of Cristal Amigon

The agency's social services supervisor, Cristal Amigon, testified that she was the social service practitioner for the children in the adoption unit. She worked with mother and the family from April to August of 2024, and felt that the visitation between mother and the children went well. During the visits that Amigon supervised between the children and father, the children asked that the maternal grandparents stay.

In July of 2024, maternal grandmother reached out to Amigon because mother had sent her ex-boyfriend a text message which resulted in a police report being generated, although no charges filed. Mother had also sent an inappropriate text message to maternal grandmother.

Amigon was concerned that it had taken three years to develop a permanent plan for the children. Adoption was the preferred plan because it offered the children stability. Amigon testified that, when the children were with the maternal grandparents, they were engaged and positive. The children were familiar with alcohol, were able to identify mother's use of it, and stated they were scared. Amigon viewed a video taken during one video visit in which mother asked the children if they wished to return to her home, and what they should tell the agency. Amigon acknowledged that she had not supervised a visit between mother and the children.

### Mother's Rebuttal Testimony

Mother disagreed that maternal grandmother had been the children's primary caregiver since they were 11 months old, only that mother and the children lived with maternal grandmother for a year after mother's divorce. Mother testified that maternal grandmother had provided childcare while she was at her employment as a dispatcher, which involved 12-hour shifts.

On cross-examination, mother was asked why the experts she called to testify all stated mother's heavy drinking began at the beginning of her dependency case in March of 2022, when mother testified her heavy drinking began in July of 2021. Mother testified that she first started drinking heavily in July of 2021 because of an emotionally abusive relationship. In November of 2021, she was given a 30-day safety plan by the agency, which closed in January of 2022. According to mother, she was "cleared," and the March 2022 incident was a "brand new infraction." Mother admitted having issues with alcohol in March of 2022, when the children were removed from her care, and she told the experts that was when she accepted the addiction even though her actual drinking began in July of 2021.

### Argument by Counsel

Counsel who represented both mother and father argued, as to the section 388 petitions, that mother and father had ameliorated the concerns that brought the children to the attention of the department and they could provide a stable home for the children. Counsel argued that mother had shown substantial change by being sober since January of 2024, attending therapy sessions, and having taken parenting classes. Counsel also argued it would be in the best interest of the children to return to her care as there was a strong bond between mother and the children.

As to the section 366.26 hearing, counsel argued that the parent-child relationship exception applied as both parents had maintained regular visitation, the children both had

a substantial emotional attachment to the parents and would benefit from that continued relationship; and severing that relationship would be "hugely detrimental" to them.

County counsel questioned the opinions of the experts who testified, noting they had "limited knowledge about the case and what was going on," because they relied on mother for information. As to the section 388 petitions, counsel argued they showed changing but not changed circumstances. Counsel also argued granting the petitions was not in the best interests of the children. Counsel argued there was no evidence to support the beneficial parent-child relationship exception, and father even failed to meet the regular visitation requirement.

Counsel for the children joined in county counsel's argument. While mother had made some changes, and there was some bond between the children and mother, counsel argued it was not in the children's best interest to go back to mother's care. Counsel asked that mother and father's parental rights be terminated.

### Juvenile Court's Ruling

The juvenile court rendered a decision on January 9, 2025, in which it addressed both mother and father's section 388 petitions and the section 366.26 request by the agency to terminate mother and father's parental rights. Because the parties stipulated that the evidence received at the hearing related to both the section 388 petitions and the section 366.26 hearing, we include the juvenile court's analysis as to both, even though it is only the section 366.26 analysis that is at issue.

In its ruling, the juvenile court first summarized the history of the case and then addressed father's section 388 petition. The juvenile court noted that, while father was the non-offending and non-custodial parent of the children, he had had fewer than 20 contacts with the children since their births and did not really have a relationship with the children. The juvenile court found no "change in circumstance" as required under section 388 related to father's relationship with the children.

16.

As for mother's section 388 petition, the juvenile court noted mother was actively engaged in an outpatient program to address her alcohol issues, was seeing an addiction specialist, has tested negative, has been seeing a private therapist, has been taking needed medication, had developed a strong support network, attended parenting classes, and participated in supervised visits with the children. The juvenile court noted Kantner's report on mother, which highlighted her strong support network, her commitment to sobriety, her access to professional support, a positive parenting approach, employment stability, a prepared living environment, and resilience and determination. But the court noted Kantner's report also included risk factors of ongoing legal issues, mental health issues, and past trauma. The juvenile court voiced concern that Kantner's opinion was based on several court reports, but also self-reported information from mother, her husband, and mother's therapist Koch. Kantner did not meet or observe interaction with the children, grandparents, social workers, or CPS. While Kantner tried to meet with maternal grandparents or the agency, and offered to do so, "mother and her attorney did not take her up on her offer."

The juvenile court also noted mother's refusal to sign a release so the agency could confirm with her outpatient program regarding her treatment and testing. The juvenile court was particularly concerned that there were no drug test results between June 12 and September 3, 2024, "a period of 83 days." The test results had been provided by mother and the agency was unable to confirm that mother attended all scheduled tests. The juvenile court also noted concerns with mother's mental health and treatment, which it could not verify, especially since mother had an "extensive history of being untruthful" to the agency and the court. Because none of the experts — Kantner, Koch, or Herbert — spoke to mother's outpatient treatment facility to confirm that mother's statements were true, the juvenile court found the evidence provided was "insufficient to determine whether the mother has changed circumstances or simply changing circumstances."

17.

The juvenile court stated that, even if it were to find that mother and father's circumstances had changed, it was unable to find that "the parent's requested orders would be in the best interests of the children." The juvenile court noted that the children had been in maternal grandparents' care for three years, where they were "thriving," promoting the children's need for permanency and stability. While mother had made positive strides, she continued to have issues related to her mental health and concerning behaviors. While the children knew mother as their mother, and enjoyed spending time with her, the juvenile court questioned whether the children were "especially bonded" to mother.

The juvenile court found the children were bonded to maternal grandparents from the beginning of the proceedings. As of the section 366.26 report, the juvenile court noted that the children were still struggling "with trauma related to mother's drinking." The juvenile court noted mother was working towards sobriety, but that "[s]obriety is precarious, and relapse is a part of recovery."

The juvenile court noted mother and father's unsuccessful attempts at reunification and stated, "Nearly three years have passed since detention while these children have waited for permanency and stability." It then denied both mother and father's section 388 petitions.

In regards to the section 366.26 hearing, the juvenile court stated it would "adopt the factual findings from the ruling in the 388 Petition, inasmuch as they are relevant to the Selection and Implementation Hearing, and … will not repeat them in this ruling, but … will incorporate them herein by this reference." The juvenile court then found that the children were likely to be adopted and addressed the beneficial parent-child relationship exception to adoption, citing the three-prong test enunciated in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*).

As to the first prong, the juvenile court found mother had regular visitation and contact with the children. It found father had not met the first prong.

The second prong addressed whether there is a relationship between the children and parent, the continuation of which would benefit the children, .i.e., whether the children have "a substantial positive emotional attachment" to the parent. The juvenile court found that the children enjoyed their time with each parent, they have a bond with mother and have affection for her, but "it is difficult for the court to find that the children are substantially, emotionally attached to their mother," especially since the children have continued expressed fear regarding returning to mother's home. The juvenile court determined that the children had "some attachment, the continuation of which may benefit the children," but it was "difficult to tell how substantial or positive [the] attachment is." The juvenile court found no such attachment between the children and father.

As to the third prong, "whether or not the relationship is such that the termination of parental rights would be detrimental to the child," the juvenile court stated that it must "weigh the detriment of severance of parental rights versus benefits of adoption." The juvenile court stated it would not address that issue as to father as he had not met his burden for the first two prongs. As to mother, the juvenile court found that the children had been in maternal grandparents' home for almost three years and even longer than that before dependency; they were emotionally stable; concerns were expressed by the children's therapists that their stability may falter if their placement was interrupted; the children had excelled in school without problems; and the children expressed a desire to stay with the maternal grandparents. In finding the beneficial parent-child relationship exception to adoption did not apply, the juvenile court concluded by stating:

> "Given the facts before the Court and the clear legislative preference, the Court believes that these children need to know they have stability, security, safety and permanence that they will receive[] by being adopted by the grandparents. [¶] The Court believes that this need outweighs the harm in severing the relationship with their parents."

It found the ICWA inapplicable and terminated mother and father's parental rights.

19.

# DISCUSSION

I.      DID THE TRIAL COURT ERR WHEN IT FOUND THE BENEFICIAL PARENT-CHILD RELATIONSHIP EXCEPTION TO ADOPTION INAPPLICABLE?

Mother argues that the juvenile court erred when it found the beneficial parent-child relationship exception to adoption did not apply. We disagree.

*Applicable Law*

At a section 366.26 hearing, the court's goal is to select and implement a permanent plan for the children. (*Caden C, supra,* 11 Cal.5th at p. 630.) If "there has been a previous determination that reunification services be terminated" and the court "determine[s] by clear and convincing evidence ... the child is likely to be adopted," the court must terminate parental rights unless a statutory exception applies. (*Id.* at pp. 630-631.)

One such exception is the section 366.26, subdivision (c)(1)(B)(i) beneficial parent-child relationship exception, which requires a parent to prove three elements: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C., supra,* 11 Cal.5th at p. 631.) This exception "is limited in scope." (*Id.* at p. 631.) It applies when " 'severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[ ]' the child." (*Id.* at p. 633.) In other words, "[w]hen the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Id.* at pp. 633–634.) Throughout this analysis, "the focus is on the best interests of the child." (*Id.* at p. 632.)

*Regular Visitation and Contact*

In examining the regular visitation and contact element, "[t]he question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C., supra,* 11 Cal.5th at p. 632.) We review the court's determination as to this element for substantial evidence. (*Id.* at p. 639.) "In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' " (*Id.* at p. 640.) Here, the juvenile court found that this first prong had been met by mother. Neither party contests this prong and we need not discuss it further.

*Substantial, Positive Attachment*

To satisfy the second element, "the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C., supra,* 11 Cal.5th at p. 636.) Factors involved in determining the benefit of the relationship include " '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs,' " as well as "how children feel about, interact with, look to, or talk about their parents." (*Id.* at p. 632.) "A positive attachment between parent and child ... is nurturing and provides the child with a sense of security and stability," and "an emotional attachment is one where the child views the parent as more than a mere friend or playmate." (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1230.) The required "significant attachment" arises from an "adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

We review the court's determination on this element for substantial evidence. (*Caden C., supra,* 11 Cal.5th at p. 639.)

21.

Although the record shows that the children had some bond with mother, substantial evidence supports the juvenile court's finding that the relationship was not a substantial, positive and nurturing one that benefitted the children at the time of the section 366.26 hearing. The children had been with maternal grandparents for almost three years at the time of the section 366.26 hearing, and had spent significant time with them prior to the current dependency case. The evidence before the juvenile court was that, while the children enjoyed visits with mother and were affectionate with her during visits, it did not appear that the bond was a "substantial, positive, emotional attachment" that would satisfy this second prong. When the agency conducted an exercise with the children to determine their perspective on the family's dynamic, both children identified maternal grandparents as their parents. One of the children alternated between calling mother "mommy" and her first name; the other placed mother in the grandmother position on a family chart. When asked about living with mother, both children said they wished to visit mother when they were older. Even two years into the dependency case, both children continued to express worry about events that occurred in mother's home and mother's continued use of alcohol. While "[a] parent's continued struggles with the issues leading to dependency are not a categorical bar to applying the exception," they may have a negative effect on the children such that they are relevant to determining the benefit of continuing the relationship. (*Caden C., supra,* 11 Cal.5th at pp. 637-638.) And neither child showed any negative effect when separating from mother after visits or video calls.

### *Detriment from Termination*

To determine whether "termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Caden C., supra,* 11Cal.5th at p. 632.) This determination is based on "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an

adoptive home without the parent in the child's life." (*Id.* at p. 633.) "In many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home." (*Id.* at p. 634.) Some "relationship[s] involve[ ] tangled benefits and burdens" which the court must "disentangl[e]." (*Ibid.*) As with the second element of the exception, the parent's struggles leading to dependency may be relevant to determining whether terminating the relationship would be detrimental to the child. (*Id.* at pp. 637-638.)

We review underlying factual determinations for substantial evidence, but "the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C., supra,* 11 Cal.5th at p. 640.)

*Analysis*

Based on the evidence before the juvenile court, we conclude the juvenile court did not abuse its discretion in finding that the harm of severing the relationship between mother and the children did not outweigh placement in an adoptive home. While the children had pleasant visits with mother, "A ' "showing [that] the child[ren] would derive *some* benefit from continuing a relationship maintained during periods of visitation" ' is not a sufficient ground to depart from the statutory preference for adoption." (*In re Andrew M.* (2024) 102 Cal.App.5th 803, 818.) At this stage of the proceedings, after reunification services have been terminated, "to justify withholding the 'security,' 'stability,' and ' "sense of belonging a new family would confer[,]" ' " there must be "some type of harm beyond the fact that [a parent's] loving visits would cease." (*Id.* at p. 820.) Here, the record contains no evidence of anything other than enjoyable visits between the children and mother. There is no evidence, for example, that the children were upset when visits ended or when mother missed a visit. (*Id.* at p. 819.) The children still became upset when they spoke about mother's drinking, and there was

23.

no evidence that mother "played a meaningful role" by taking part in the children's medical appointments. (*Ibid.*)

In sum, considering the totality of the evidence, a reasonable conclusion in this case is that the benefits of adoption—security and stability—outweighed the harm of severing the parental relationship—loss of the potential for enjoyable visits. We find no abuse of discretion on the part of the juvenile court in making this determination.

## II. DID THE AGENCY FAIL TO FULFILL ITS DUTY OF INQUIRY AS REQUIRED BY THE ICWA?

Both mother and father contend the agency failed to comply with its duties of initial inquiry pursuant to ICWA and section 224.2. Although the juvenile court held that ICWA did not apply, the agency concedes that it did not fulfill its inquiry duties with respect to certain relatives with whom the children had contact. We accept the agency's concession as to its duties of inquiry, and we therefore conclude the juvenile court's ICWA findings were inadequately supported by the evidence. (See *In re D.S.* (2020) 46 Cal.App.5th 1041, 1051 ["where the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied"].)

Section 224.2 imposes an "affirmative and continuing duty" upon the agency and the juvenile court to inquire whether a child subject to juvenile dependency may be an Indian child. (§ 224.2, subd. (a).) Section 224.2, subdivision (b) creates an expanded duty of initial inquiry that requires the agency to ask "extended family members" and "others who have an interest in the child" whether the child may be an Indian child. ICWA defines " 'extended family member' " by "the law or custom of the Indian child's tribe" or, absent such law or custom, as "a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § § 1903(2); Welf. & Inst. Code, § 224.1, subd. (c).)

The record indicates that biological maternal grandfather and paternal grandparents were present at an agency team meeting on January 23, 2023, the children had video visits with their biological grandfather, and the paternal grandmother was present at a court hearing via telephone and also during a video call between the children and father. In addition, maternal grandparents submitted a caregiver information form indicating that the children had contact with their various extended family members. However, as conceded by the agency, there does not appear to be any information indicating that an inquiry was completed with any of these relatives (other than maternal grandmother) or that the relatives could not be identified or contacted.

We accept the agency's concession, and therefore conclude that conditional reversal and remand is appropriate for the limited purpose of allowing the agency to conduct an adequate ICWA inquiry. (See *In re Dezi C.* (2024) 16 Cal.5th 1112, 1125.)

**DISPOSITION**

We conditionally reverse the juvenile court's order terminating mother and father's parental rights and remand the matter to the juvenile court with directions that the agency comply with the inquiry provisions of Welfare and Institutions Code section 224.2. If, after appropriate completion of initial inquiry, neither the agency nor the juvenile court has reason to believe the children are Indian children, the juvenile court shall reinstate the order terminating mother and father's parental rights. Alternatively, if after completing further inquiry, the agency or the juvenile court has reason to believe that the children are Indian children, the court shall proceed accordingly.